# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | No. 89-CR-21-CJW-MAR |
| vs. | |
| BARTON RAY CRANDALL, | **MEMORANDUM OPINION & ORDER** |
| Defendant. | |

## I. INTRODUCTION

This matter is before the Court on defendant's Motion for Compassionate Release filed on September 16, 2020. (Doc. 177). On September 30, 2020, the government timely filed a resistance. (Doc. 184). On October 14, 2020, defendant timely filed a reply. (Doc. 187). For the following reasons, the Court **denies** defendant's motion.

## II. RELEVANT BACKGROUND

In early 1989, defendant and R.D. conspired to rob two banks. (Doc. 168, at 5); *see also United States v. Crandall*, No. CR89-0021, 1999 WL 33656814, at *1 (N.D. Iowa Jan. 1999).[1] Defendant initiated the conspiracy and recruited R.D. in the scheme. (Doc. 168, at 5).

The first robbery occurred at Norwest Bank in Newhall, Iowa on April 25, 1989. *Crandall*, 1999 WL 33656814, at *1. In preparation, defendant familiarized himself with the bank's layout and security cameras. (Doc. 168, at 6). Defendant also borrowed a shotgun and watched as R.D. sawed it off. (*Id.*, at 5–6). The shotgun was loaded with

---

[1] Aside from defendant's final presentence investigation report, filings prior to June 2005 appear on the online docket but are not accessible.

five rounds of buckshot, although defendant suggested using slug rounds. (*Id.*, at 6).[2] While in route to the robbery, defendant and R.D. discussed who should hold the shotgun and whether they were willing to shoot someone if needed. (*Id.*). It was decided that R.D. should hold the shotgun and default to firing it into the air. (*Id.*). Upon arriving at the bank, defendant parked the car in an alley, entered the building, announced the robbery, and ordered everyone to the floor. (*Id.*, at 6–7). Defendant took all the cash from the tellers' drawers and then demanded to know where the rest of the money was. (*Id.*, at 7). Defendant instructed a teller to get up, go to the bank's safe, and fill a bag with cash. (*Id.*). When the teller returned with the bag, defendant took the money and left the bank with R.D. (*Id.*). The robbery lasted approximately one minute. (*Id.*). Although no specific amount is stated, the robbery yielded several thousand dollars. (*Id.*). Defendant and R.D. later disposed of the shotgun by throwing it in a creek. (*Id.*).

The second robbery occurred at Atkins Savings Bank and Trust in Atkins, Iowa on July 19, 1989. *Crandall*, 1999 WL 33656814, at *1. Defendant and R.D. agreed to rob a second bank after R.D.'s mechanic garage was burglarized. (*Id.*, at 8). The pair acquired a new shotgun from a pawn shop and R.D. again sawed it off. (*Id.*, at 9). The shotgun was again loaded with five rounds of buck shot. (*Id.*). Like the first robbery, defendant again parked the car in an alley behind the bank, entered the building, ordered the tellers to the floor, demanded that one teller retrieve money from the safe, and left after obtaining the money. (*Id.*). The second robbery yielded around $10,000. (*Id.*). Following this robbery, defendant laundered his share of the money and destroyed potential evidence. (*Id.*, at 10). A month later, defendant began threatening R.D. because defendant was worried R.D. might provide information to police. (*Id.*, at 11). R.D. ultimately did provide information to police about the two robberies. (*Id.*).

---

[2] It is not clear in the PSR who loaded the shotgun, but the implication is that R.D. did so.

2

On September 27, 1989, a grand jury issued an eight-count Indictment charging defendant with two counts of bank robbery ("Count 1" and "Count 2"), two counts of using and carrying a firearm during and in relation to a bank robbery ("Count 3" and "Count 4"), one count of being a felon in possession of a firearm ("Count 5"), one count of possessing a firearm not registered to him ("Count 6"), one count of conspiracy to commit armed bank robbery ("Count 7"), and one count of possession of marijuana ("Count 8"). (Doc. 1); *see also Crandall*, 1999 WL 33656814, at *1. After Count 8 was severed out, defendant pled guilty to Count 5 and a jury found him guilty of Counts 1, 2, 3, 4, 6, and 7. *Crandall*, 1999 WL 33656814, at *1.

On March 28, 1990, the United States Probation Office filed defendant's final presentence investigation report. (Doc. 168). Defendant was, at that time, 26 years old and residing in Cedar Rapids, Iowa. (*Id.*, at 1–2). Defendant's mother died of a cerebral hemorrhage when defendant was 15. (*Id.*, at 20–21). Defendant's father, who was often away due to work, lamented that defendant was "often left to take care of himself" as a result. (*Id.*). By his senior year of high school, defendant was living with a friend. (*Id.*, at 20). Although defendant graduated high school, staff noted that he was significantly affected by his mother's death and exhibited deceitful behavior. (*Id.*, at 23). Defendant was briefly married but had no children. (*Id.*, at 20–21). Defendant's work history was episodic. (*Id.*, at 23–24). Notably, he was terminated on several occasions for providing false statements or allegedly engaging in fraudulent conduct. (*Id.*). Defendant had recently found some success as a car salesman. (*Id.*). Aside from some neck, back, and knee pain from prior sporting injuries, defendant was in good physical health. (*Id.*, at 23). As to mental health, defendant was diagnosed with adult antisocial behavioral disorder and possible adjustment disorder. (*Id.*, at 22). It was noted that he began abusing alcohol following his mother's death. (*Id.*). He also abused marijuana and

3

cocaine in the months prior to the instant offense. (*Id.*, at 23). Defendant had previously completed drug treatment once while incarcerated. (*Id.*).

Defendant's criminal history consisted of theft and burglary. In April 1982, defendant was convicted of burglary for stealing a microwave from a friend's home and selling it to his high school teacher. (*Id.*, at 15). In August 1982, defendant was convicted of theft for stealing a motorcycle, stripping it for parts, and abandoning it in a creek. (*Id.*, at 16). In December 1982, defendant was convicted of burglary for stealing three firearms from a friend's house. (*Id.*, at 16–17). Defendant served concurrent sentences for all his 1982 offenses and was paroled in 1984. (*Id.*, at 17). While on parole, it was noted that defendant's employers accused him of theft and dishonesty and that defendant refused to pay any restitution. (*Id.*). Defendant was ultimately discharged from parole in 1987. (*Id.*).

On April 2, 1990, the Court sentenced defendant. (*Id.*, at 1). The Court found defendant's two prior burglary convictions were crimes of violence and, thus, that defendant was a career offender. *See* (Doc. 177-1, at 3). Defendant was in criminal history category VI with a total offense level of 34, yielding an advisory guideline range of imprisonment of 262 to 327 months followed by three to five years on supervised release. (Doc. 168, at 19). The Court sentenced defendant to 262 months' imprisonment on both Counts 1 and 2, 60 months' imprisonment on Count 3, 240 months' imprisonment on Count 4, 120 months' imprisonment on Count 5, 120 months' imprisonment on Count 6, and 60 months' imprisonment on Count 7. *Crandall*, 1999 WL 33656814, at *1. Counts 1, 2, 5, 6, and 7 were to be served concurrently while Counts 3 and 4 were each to be served consecutively. *Id.* Thus, defendant's total term of incarceration was 562 months—i.e. 46 years and ten months—followed by five years on supervised release. *See* (Doc. 177-1, at 1). Defendant appealed his sentence but was unsuccessful. *Crandall*,

4

1999 WL 33656814, at *1. In 2005, defendant's sentenced was reduced to 526 months imprisonment. (Doc. 150).[3]

Defendant filed his motion for compassionate release now before the Court on September 16, 2020. (Doc. 177). Defendant is currently incarcerated at Butner Medium I FCI ("Butner I") with a projected release date of April 26, 2027.[4]

### III. COMPASSIONATE RELEASE STANDARDS

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the [Bureau of Prisons] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the [Bureau of Prisons] that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

---

[3] Defendant has also challenged his sentence in other ways without success. *See, e.g.*, (Doc. 128); (*Crandall v. United States*, No. 1:16-cv-00127-LRR-CJW (Doc. 1) (June 22, 2016)).

[4] *Find an Inmate*, BOP, https://www.bop.gov/inmateloc/.

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") section discussing compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. CR10-222, 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019). USSG Section 1B1.13 provides extraordinary and compelling reasons exist when the defendant is (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physically or mentally deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, experiencing serious deterioration due to age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's ("FSA") changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. CR89-0072, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, No. CR03-37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has concluded USSG Section 1B1.13, although it is a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

## IV. DISCUSSION

### A. *Exhaustion of Administrative Remedies*

Section 3582(c)(1)(A) states a court may reduce a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has held that defendants are not required to administratively appeal a warden's denial and may fulfill the exhaustion requirement of Section 3582(c)(1)(A) by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

Defendant submitted requests for release to the warden of his facility on April 20 and 27, 2020. (Docs. 177-3, 177-5, & 177-6). On May 5, 2020, the warden denied his request. (Doc. 177-7). Thereafter, defendant continued to pursue administrative relief in the BOP, but was unsuccessful. (Docs. 177-8, 177-9, 177-10, 177-11, 177-12, 177-13, 177-14, & 177-15). The government agrees that defendant has exhausted his administrative remedies because 30 days have elapsed since defendant submitted his request to the warden. (Doc. 184, at 12–13). The Court agrees and thus finds defendant has fulfilled the exhaustion requirement of Section 3582(c)(1)(A).

### B. *Extraordinary and Compelling Reason*

In asserting an extraordinary and compelling reason for his release, defendant cites two separate bases. First, defendant argues his age and underlying health conditions compel his release during the COVID-19 pandemic. (Doc. 177-1, at 14–17). Second, defendant argues his term of incarceration would be shorter if he were sentenced today in light of the FSA and other changes in the law. Specifically, defendant notes that his sentences on Counts 3 and 4 would not be required to run consecutively, his two prior burglary convictions would not qualify as predicate offenses, and his advisory guideline range would be lower. (*Id.*, at 11–14). The Court will address both bases in turn.

7

### *1. Age & Health Conditions During the COVID-19 Pandemic*

Defendant argues an extraordinary and compelling reason for release is present because his age of 56 and chronic neck pain, chronic arm pain, cervical stenosis, and right hip arthritis put him at a high risk of severe complications or death if he contracts COVID-19. (*Id.*, at 16); *see also*, *e.g.* (Doc. 177-16, at 7, 11, 20, 22, 26–28, 35, 42, 50, 62, 87, 94–98).

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases). The Centers for Disease Control and Prevention ("CDC") does not recognize chronic neck pain, chronic arm pain, cervical stenosis, or hip arthritis as health conditions which actually or potentially raise a person's susceptibility to COVID-19.[5] A person's risk of serious illness or death from COVID-19 does, however, increase with their age.[6] Eight out of ten deaths related to COVID-19 in the United States have been in adults older than 65. *Id.* Persons over age 85 are at "[t]he greatest risk for severe illness from COVID-19." *Id.*

Defendant's health conditions, even if they are as serious as he asserts, are simply not relevant to COVID-19. *See United States v. McCauley*, No. 14-CR-94-CJW-MAR, 2020 WL 3513701, at *5–6 (N.D. Iowa June 29, 2020) (finding the defendant's "excruciating" chronic pain was not relevant to COVID-19 but ultimately concluding defendant presented an extraordinary and compelling reason for release, albeit

---

[5] *People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (Nov. 2, 2020).

[6] *Older Adults*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (Sept. 11, 2020).

marginally, because he also suffered from chronic obstructive pulmonary disorder, which is relevant to COVID-19). The conditions defendant cites are not recognized as actual or potential risk factors by the CDC and, thus, the Court affords them little weight. Although the Court notes defendant's age of 56, he is not in or immediately close to the high-risk age group of 65 years or older.

The Court also notes that Butner I currently has very few cases of COVID-19. There are no active cases of COVID-19 among its inmate population, although nine inmates have died of COVID-19 and another 172 have recovered.[7] There is one active case of COVID-19 among the staff and 37 other staff members have recovered, but none have died. *Id.* The Court affords minor weight to Butner I's current status, however, given how quickly COVID-19 can spread inside a prison facility despite the best efforts of staff. Even if Butner I had a significant amount of COVID-19 cases, the Court would still find that defendant is not particularly at risk given the health conditions cited here.

On balance, defendant's age and health conditions do not present an extraordinary and compelling reason for release. The Court next turns to whether changes in the law compel release here.

### 2. *Changes in the Law*

The Court must first address whether it can properly consider grounds not explicitly listed in Section 1B1.13 as extraordinary and compelling circumstances before turning to the merits of defendant's arguments.

#### a. *Effect of Section 1B1.13*

As stated above, this Court has held that "Section 1B1.13 does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant" because it predates the FSA's changes to Section 3582(c)(1)(A) which enabled

---

[7] *COVID-19*, BOP, https://www.bop.gov/coronavirus/.

9

defendants to bring motions for compassionate release on their own behalf. *See Burnside*, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (citing *United States v. Rivernider*, No. 3:10-cr-222(RNC), 2019 WL 3816671, at *2 (D. Conn. Aug. 14, 2019)). Indeed, Section 1B1.13 specifies that it concerns motions brought by the Director of the BOP under Section 3582(c)(1)(A). Application Note 4 to Section 1B1.13 states explicitly that a sentence reduction under Section 3582(c)(1)(A) "may be granted only upon motion by the Director of the [BOP.]" Section 1B1.13 has not been updated to encompass motions brought by defendants under Section 3582(c)(1)(A). Thus, by its own terms, it is not directly applicable and not binding on courts considering a motion for compassionate release brought by a defendant on their own behalf. *See, e.g.*, *United States v. Brooker*, 976 F.3d 228, 235 (2d Cir. 2020).

Although not binding, the Court has acknowledged that Section 1B1.13 remains a "helpful guidepost" in determining whether extraordinary and compelling reasons for release exist. *See, e.g.*, *United States v. Tillman*, No. 12-CR-2024-CJW-MAR, 2020 WL 3578374, at *3 (N.D. Iowa June 30, 2020); *see also Rivernider*, 2019 WL 3816671, at *2. Section 3582(c)(1)(A) itself does not define what constitutes an extraordinary and compelling reason for release. Instead, Congress directed the United States Sentencing Commission (the "Commission") to "describe what should be considered extraordinary and compelling reasons for sentence reduction[.]" 28 U.S.C. § 994(t). Congress intended such reductions to be "consistent with [the Commission's] applicable policy statements[.]" 18 U.S.C. § 3582(c)(1)(A)(ii). Although Section 1B1.13 is not binding, it remains broadly applicable because it is the only authority from the Commission defining what constitutes an extraordinary and compelling reason for release. Further, the parameters of Section 1B1.13 are still properly considered because the FSA "did not change the statutory criteria for compassionate release," but rather, merely "change[d] the procedures, so that the [BOP] is no longer an obstacle to a court's consideration of

10

whether compassionate release is appropriate." *United State v. Fox*, No. 2:14-cr-03-DBH, 2019 WL 3046086, at *2 (D. Me. July 11, 2019). Thus, the grounds constituting extraordinary and compelling circumstances for compassionate release listed in Section 1B1.13 should not be wholly disregarded even though they are not binding.

Application Note 1 to Section 1B1.13 cites only three circumstances that may constitute an extraordinary and compelling reason for release. Broadly, those circumstances concern (1) a defendant's medical condition; (2) a defendant's age; and (3) a defendant's changed familial circumstances. The Court has already rejected defendant's arguments here regarding his health and age. Defendant does not assert any argument regarding changed familial circumstances. Thus, the only potential ground for release defendant can rely upon in citing changes to the law is the catch-all provision in Application Note 1(D). This provision states that "the Director of the Bureau of Prisons" may find that some other circumstance exists which constitutes "an extraordinary and compelling reason other than, or in combination with" the circumstances specifically listed. The FSA's enabling of defendants to bring motions for compassionate release logically applies to Application Note 1(D).[8] Thus, defendants can rely on Application Note 1(D) in asserting extraordinary and compelling circumstances not specifically listed.

That said, courts should not stray far from the categories explicitly listed; health, age, and familial circumstances. Failing to heed those broad categories as guideposts would turn the compassionate release framework into a mechanism by which a court could simply reduce any sentence it disagrees with for any reason it concludes is

---

[8] The government notes that the BOP has issued a program statement discussing circumstances it considers to be extraordinary and compelling. (Doc. 184, at 23). The Court finds this program statement immaterial. Because defendants may now move for compassionate release on their own behalf, what the BOP itself considers to be extraordinary and compelling circumstances does not control. Moreover, the program statement does not offer any further guidance because it does not list any grounds not already discussed in Section 1B1.13.

11

extraordinary without respect to the Commission's guidance. In sum, although the Court recognizes that it is not wholly constrained by Section 1B1.13, it is highly skeptical of expanding the compassionate release system into, essentially, a discretionary parole system. *See United States v. Green*, No. 06-CR-53-CJW-MAR, 2020 WL 3913498, at *5 (N.D. Iowa July 10, 2020) ("Whether the Court finds defendant's sentence harsh, however, is not the question. Instead, the question is whether defendant's . . . incarceration has satisfied the goals of 3553(a) in light of [the extraordinary and compelling reasons presented.]"). Instead, courts should broadly follow the grounds for compassionate release listed in Section 1B1.13 and consider only issues of health, age, family, or other circumstances which are similarly personal and individualized.

### b. *Effect of Non-Retroactive Changes in the Law*

Defendant argues that an extraordinary and compelling reason for release is present because his term of incarceration would be significantly shorter if he were sentenced today. First, defendant notes that the FSA eliminated the mandatory sentence-stacking provisions of Title 18, United States Code, Section 924(c) and, thus, his sentences on Counts 3 and 4 would not be required to run consecutively if rendered today. (Doc. 177-1, at 11). Defendant acknowledges that Congress did not make this amendment retroactively applicable. (*Id.*). Second, defendant argues that his prior burglary convictions would no longer be considered crimes of violence in light of *Mathis v. United States*, 136 S. Ct. 2243 (2016). (*Id.*, at 13–14). The Eighth Circuit Court of Appeals has held that *Mathis* did not announce a retroactive rule of law. *Winarske v. United States*, 913 F.3d 765, 768 (8th Cir. 2019). Last, defendant notes that his guideline range would be lower because, as a result of his burglary convictions no longer being predicate offenses, he would not be considered a career offender. (Doc. 177-1, at 14). In sum, defendant argues these non-retroactive changes in the law constitute extraordinary and compelling circumstances for compassionate release.

Courts disagree about whether sentencing disparities created by non-retroactive changes in the law can constitute an extraordinary and compelling reason for compassionate release. *Compare United States v. O'Bryan*, No. 96-10075-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020) (finding the fact that the defendant's sentence would have been "radically different" if he were subject to the FSA constituted an extraordinary and compelling reason for release), *with Fox*, 2019 WL 3046086, at *4 ("[T]he compassionate release provision is not an end-run around the Commission's authority to make certain Guideline changes *not* retroactive or Congress's decision to reduce sentences for some crimes but not others, or a means to redress perceived disparities with other sentenced defendants.") (emphasis in original).

The Court finds that non-retroactive changes in the law cannot constitute an extraordinary and compelling reason for compassionate release. Chief Judge Leonard T. Strand, in discussing the FSA's non-retroactive effect on Section 924(c) in *United States v. Gashe*, arrived at the same conclusion:

> For several reasons, I conclude that the changes the FSA made to § 924(c), either alone or in combination with Gashe's rehabilitation, do not constitute an extraordinary and compelling reason justifying compassionate release.
>
> First, in enacting the FSA, Congress was cognizant of the difference between making statutory changes retroactive or prospective. Congress chose to make some changes retroactive. . . . Other portions applied only prospectively. . . . Had Congress intended the entire FSA to apply retroactively, or had Congress intended FSA changes to constitute extraordinary and compelling reasons under the compassionate release statute, it could have said so.
>
> Second, finding that the FSA's changes are extraordinary and compelling would make virtually every defendant sentenced before the FSA became law eligible for a reduced sentence. This would render the word "extraordinary" meaningless. Compassionate release would no longer be based on the individual characteristics of each defendant seeking

13

compassionate release. Instead, it would be a categorical reduction. While Congress clearly intended the FSA's amendments to the compassionate release statute to increase its usage, there is no indication Congress intended compassionate release to operate as broadly as Gashe requests.

Third, finding an extraordinary and compelling reason in this situation is too far removed from USSG § 1B1.13. . . . While I am not bound by § 1B1.13 in deciding whether extraordinary and compelling reasons exist, it is a helpful starting point. Nothing in that section suggests that non-retroactive changes to sentencing law constitute extraordinary and compelling reasons. Rather, the Guideline instructs that extraordinary and compelling reasons are those based on medical conditions, age or family circumstances. § 1B1.13 cmt. n.1. Adding classes of potential extraordinarily and compelling reasons wholly divorced from those types of personal circumstances is more than the amended compassionate release statute permits.

No. CR07-4033-LTS, 2020 WL 6276140, at *2–4 (N.D. Iowa Oct. 26, 2020).

The Court finds the reasoning in *Gashe* persuasive and adopts it here. As to all the bases cited by defendant, the Court finds it improper to effectively make non-retroactive changes in the law retroactive by deeming them to be extraordinary and compelling circumstances.[9] Such changes are not the personal, individualized circumstances generally contemplated by Section 1B1.13. This position is consistent with the Eighth Circuit Court of Appeals decision in *United States v. Loggins*, which affirmed the district court's conclusion "that a non-retroactive change in law [does] not support a finding of extraordinary or compelling reasons for release." 966 F.3d 891, 893 (8th Cir. 2020); *see also United States v. Saldana*, 807 Fed. App'x 816, 820 (10th Cir. 2020) (same).

---

[9] Such changes may, however, be relevant to the Court's analysis under Title 18, United States Code, Section 3553(a) in determining whether the goals of sentencing have been achieved. *See United States v. Smith*, 04-CR-2002-CJW-MAR, 2020 WL 3913482, at *7–8 (N.D. Iowa July 10, 2020). Such changes speak to the potential sufficiency of a defendant's sentence, but do not themselves constitute an extraordinary and compelling reason to reduce a defendant's sentence.

14

Defendant argues, as to Section 942(c) specifically, that Congress's decision not to make the FSA's changes retroactive "does not mean that [Congress] chose to foreclose all means of redressing draconian sentences imposed" therein. (Doc. 177-1, at 12). It would be paradoxical, however, to find that extraordinary and compelling reasons for release exist based on a change in the law that Congress intentionally made inapplicable. Congress clearly knows how to make laws apply retroactively and chose not to do so here. In effect, the Court would be finding that the change should apply regardless of Congress's intent. Judges, as unelected officials, should not be making law by effectively making a legislative change retroactive when that very legislature elected by the people chose not to do so. Again, the question here is not whether the Court finds defendant's sentence harsh. Rather, the question is whether extraordinary and compelling reasons exist to reduce defendant's sentence. The Court finds that none exist here.

Further, defendant's rehabilitation, however admirable, cannot alone justify compassionate release. Indeed, Title 28, United States Code, Section 994(t) states that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for release. In the absence of an extraordinary and compelling reason, the Court cannot grant compassionate release.[10]

Congress abolished parole in 1984. The compassionate release authority granted courts is not a substitute for parole. Congress has not granted judges the authority to sit in review of every sentence and order release when in the judges' opinions the offenders have served enough time or have achieved a sufficient level of rehabilitation. Such an interpretation of compassionate release would go beyond the limited authority granted to courts to modify a sentence once it is imposed.

---

[10] In light of its conclusion, the Court need not analyze defendant's motion under Section 3553(a).

## *V.  CONCLUSION*

For these reasons, defendant's Motion for Compassionate Release is **denied**. (Doc. 177). Defendant must serve the remainder of his term of incarceration as previously directed. (Doc. 150).

**IT IS SO ORDERED** this 3rd day of December, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa